The Court had granted a total of 25 minutes of oral argument time to each side. I understand that Mr. Travis is going to speak for 15 minutes, followed by Mr. Smiland with five, and there will be five minutes reserved for rebuttal, which Mr. Travis will deliver. On the appellee's side, or cross-appellant side, Mr. Harrell will have 15 minutes, followed by Ms. Fernald with ten minutes. Okay? Mr. Travis, when you're ready, you can begin. May I proceed? Yes, please. May it please the Court, my name is Jeff Travis. I'm here today with Marshal Smiland, and I'm going to address, specifically, Ancor's claim that we were entitled to a jury trial on our deck action. I'm then going to turn my attentions to their cross-appeal, primarily, as you saw, after we brought the appeal, they brought a multifaceted appeal, and the primary issue is that it never should have gone to the jury, so I'll address that issue as well, and then Mr. Smiland will address the Landon's attacks on our damage. You might want to pull that microphone a little bit closer. Oh, I'm sorry. I can hear you a little better. Is that better? Yes, definitely. Sorry. I never have this problem at home. Make no mistake about it, Ancor is here today because the district court erred in denying Ancor's right to a jury trial on its declaratory judgment claim. That's why we brought this appeal. Ancor is an independent sponsor in the private equity world. It looks for deals. It identified ICON as a target and put it under an LOI, and then it brought Landon to the transaction as an investor. Ancor proceeded to spend large sums of money on due diligence, quality of earnings reports for CPAs, environmental reports, et cetera. It spent a lot of time on putting together a business plan. This is what Ancor does. They put a business plan to grow the company after the acquisition, and then the last thing we did was we hired lawyers to put the deal together. After Ancor did all of this, Landon and ICON went behind our back and did a deal without us. The problem is, under Section 8 of the contracted issue in this case, that's the non-circumvention clause. They can't do that. The contract says they can't do any deal. Well, it says Landon can't do any deal. I was going to say, it's not they, it's Landon. Right. It's the Landon LOI, right? Correct. And that's why we brought the breach of contract claim against Landon, and that's why our primary appeal is against Landon. We do have an appeal against ICON. We think they tortuously interfered, and we're asking the court to address that later, but the primary point here is that Landon went behind our back and did this deal, and the contract says that Landon has to pay us. Well, it says they have to get our permission first, and then they have to pay us all of our payments, reimbursements, and other consideration. So we brought the claim for breach of contract. The jury found they breached it. The jury awarded us our damages. That was the management fee and the transactional fee. Now, we were My client, Randy Keene, testified that this is the most important thing we get when we bring these deals together, and that is the promote payment. But we had an issue with the promote payment. We couldn't claim those as damages at the trial court because they're subject to a contingency. The contingency is after everybody puts their money in and the company is later sold, the company has to sell for an amount where all the investors get their money back plus an 8% return, and then we get 20% of every dollar after that. So the promote interest is our reward when we grow the company. Has it been sold yet? The company has not been sold yet. If it had, we would have brought a claim for breach, and this is the dilemma we are in. We couldn't wait until the company sold. That may be three or four years from now. The breach occurred when they did the deal. So we brought the But we had to seek a declaratory judgment that we'd be entitled to those future payments if and when that contingency occurs. That is an issue that should have gone to the jury and the judge didn't let it go. Was there anything else in Section 5 of the LOI that was at issue? No, not really, Your Honor. I mean, so the only thing that you're saying is other consideration that wasn't already covered by the jury would be the promote interest. Exactly. What about the other categories that are in that Section 5? Like there's a preferred investment return hurdle of 8% compounded quarterly. That's all part of the definition of the promote. That's what I was talking about. The investors get their money in, and then they get their money out, plus an 8% return, and then the promote kicks in. I was going to say, I thought the promote interest was just the 20% once the company sold. Right. But the other things that are in Section 5 happen regardless of whether ICON or the NUCO was sold later on, or am I reading that right? I would hesitate to tell Your Honor that he's not reading the contract right, but we're not seeking any additional relief if it's in there. We saw our consideration as three things, the closing payment, the management payments, and the jury awarded those, and then the promote. Well, that's what I'm getting at, though, is you see your consideration as those three things. How do we find support for what consideration is in the actual agreement? Your Honor, I don't think you have to get to that, because the issue here is the non-circumvention provision in Section 8C, and it says that if—well, what it says is they can't do a deal unless we agree— Right. That's the one that references payments, reimbursements, or other consideration. Right. I'm trying to get at what—I mean, I'm assuming that you're traveling under the other consideration part of that, or are you not? At the district court level, we focused on the other consideration because we saw them as three things, payments that we got, reimbursements that we got. So what's the missing piece? Reimbursements were Section 9? Yes. That's your sort of out front deal, due diligence, and all those other things to try to bring it together. Right. Which they didn't pass, by the way. And that's pretty clear, they owed us that much at least. I'm sorry, what was your question again, though, Your Honor? I'm grappling with what terminology you're traveling under. 8C is the part that's binding, right? That was actually binding and survived, arguably. Yes. We are traveling under 8C. But I'm trying to get back to Section 5, which was not binding, right? Right. It's made binding by Section 8C, though. But then you're only traveling under that 20% promote interest there, not the other categories that are also in Section 5. Sorry, that's where you're losing me. I'm not traveling under the other provisions under Section 5. You're not seeking the other forms of compensation that are outlined there, or, I mean, you're saying that all folds into the promote interest. It was my reading that the Section 5 really defines the promote interest because it's hard to succinctly define. But if you read through that, what they're saying is the principal equity investment will get a return of their money proportionate to their ownership. That's A. B is then they get the 8% compounded return. And then C is the promote interest of 20%. And so what they're saying, and the reason I think you may be getting, I don't want to say confused. I hate to use that word. But where we're getting off track is there's also a catch up in the concept of the promote interest, and that gets pretty complicated. But that's all that's set out in Section 5, ultimately, is our promote interest. And so that's what we're seeking. And I want to— Everything else the jury awarded came under Section 3? I'm sorry? Everything else the jury awarded would have come under Section 3? Management fees, the— Section 9 and Section 3, yes. Right, okay. So I want to make sure I leave some time for my final argument, so I'm going to kind of do a jury trial explanation here real quickly if I could. Obviously the Declaratory Judgment Act doesn't provide for a jury trial, but the Seventh Amendment of the Constitution does. It provides, in suits at common law, a right of a jury trial shall be preserved. And so the question really comes down to what is a suit at common law, and the Supreme Court has told us that that is suits where the legal rights are being ascertained and determined as opposed to equitable rights. And so, scroll forward, the Terry case gives us this test. You're supposed to look at the nature of the issues involved, the remedy the litigant seeks, and then after Terry came a case called Gulfstream, and the court said, look, you need to—because the Declaratory Judgment Action is neither equitable or legal inherently, you need to look at the cause of action that would have been brought had Congress not provided for the Declaratory Judgment Remedy. So is your position—I guess your position is that—you kind of make alternate arguments. One, it should have gone to the jury. That sort of rests on the idea that the contract was ambiguous, right? Yes. Your lead position is that the contract's ambiguous. Then you also argue, well, but to the extent the district court could have decided this, it should have granted declaratory relief, not denied it. Right. What basis did the district court give for denying? Denying the JML? Yeah. It was that there was plenty of evidence to show there was a contract and there was a breach and that there were damages. So that takes me to actually my next argument, so thank you for the lead-in. They've argued that the JML should be granted because the court erred. They want to ignore all that evidence that the jury and the judge heard, and they want to say the court erred in finding ambiguity in 8C because their position is 8C only applies during the due diligence period. Well, to respond to that, all I have to do is ask you to read 8C. We're talking about two ambiguities, though. One is what does it mean for any time? You can't enter the deal at any time, but the other ambiguity I was actually asking about was what does consideration mean? In other words, what's included in that term 8C versus what's not included? Correct. Because they also say, I guess maybe they'll say it when they get up, but the promoted is not included. Right. One of the binding part of the agreement. Either way, you are 100% correct. There are two ambiguities in that provision. Either way, we should have got to the jury on both of those issues then, and that was where the court erred. They're saying, though, it's interesting. I've got four minutes, I guess, so I'm going to get back to their 8C argument. Their 8C argument is that due diligence, the due diligence period was the extent of the non-circumvented. It only ran during the due diligence period, and as I already told you, all you have to do is read 8C, and you'll see that that's not the case. But they back up and say, well, wait a minute. Read all of 8C. It's a clever argument, but it really doesn't hold water because we invite you to read all of 8C. 8C's prefatory paragraph says that we won't circumvent them during the due diligence period. That's true. And then it says in furtherance of these agreements, the parties otherwise agree as follow. They made a big deal out of the word in furtherance, and before I got on the plane, I actually just looked it up. The definition of is advancing, moving forward, progressing, in addition to. So the way you read that is, yes, during the due diligence period, neither party can circumvent the other, but moving forward, we've got three specific agreements. The first one is if Landon doesn't want to do the deal, we still can, even during the due diligence period. So the prefatory paragraph in 8C applied during the due diligence period, but then paragraph 8B says, at the end of the due diligence period, we, not Landon, but ANCOR can do the deal without Landon. So now that applies clearly after the due diligence period. And then you get to section C, and it starts with notwithstanding the foregoing, and my client testified, well, that means, you know, whatever you said here before doesn't matter. This is the real agreement, and the real agreement is they're not supposed to enter into an agreement at any time. And then my client went into great detail explaining why that's so. He talked about how we've given them not just the due diligence, but our plan moving forward. We've shown them, you know, we've kind of opened up the curtain and shown them everything we've got, and for them to take that. And remember, in this transaction, the evidence showed not only did they do a deal without us, but they used our due diligence, our quality of earnings report, to close on their deal, and that's exactly what this is designed to protect against. So they say the due diligence period limits us. We say, no, just read the language. It says at any time. We're not taking the position that that means forever. That's what they tried to tattoo us with. It means in perpetuity. It means forever. No. Mr. Keene was pretty clear. He said several times, and they quoted you the testimony where he actually reads the contract, and we can't run from the language in the contract. It says at any time. But he says several times, no, forever didn't matter. It was to protect my interest in this transaction. And I didn't have to get to forever. I only had to get to a couple days and the betrayal occurred. I only had to get to four months. Before your time runs out, the figure, the 80%, there seems to be some confusion as to how that is calculated into the amount of the judgment, which resulted, I guess, in the 246,875. What is the, do you think that number is correct, or do you think it should be more? So Mr. Smiley can address that, but I'll answer your question. It's a pretty easy answer. It says cost we incurred. We incurred the 362. Now, we were told the deal was dead. It was months later when we found out the deal happened. So we had gone back in the meantime and negotiated dead deal discounts. So we were only initially claiming 80%, but in those demand letters that we sent them before they closed, we were saying, no, pay us 100% because we don't want to go back and lie to our vendors like you're asking us to do. This deal is closing, and you're using, for instance, Baker Tilly's quality of earnings report. You're using their report. So we feel like we have to pay for it. And at trial, my client testified, if I'm awarded 100%, I'm not going to keep it. I'm going to pay those vendors. I'm not going to continue this charade that the deal didn't close. So that's why we say we're entitled to 100% of those expenses. So I see my time is almost up. I'll just say in closing, remember, you really can't come to the conclusion that this is an equitable remedy we're seeking. They're going to argue that in a minute. They're going to argue an equitable lien. It's not an equitable lien. A lien is something where you hold and trust property, and the property is clearly defined. That's not what happened here. We're asking for a future payment. It's clearly a legal argument we're seeking, and construction of a contract and damage is later. And, all right, thank you, Your Honor. Appreciate it. Mr. Smiland, we'll hear from you at this time. Good afternoon, Your Honors, and may it please the court. My name is Marshall Smiland on behalf of Vancouver Holdings LP. And as Mr. Travis said, I intend to address Landon's appeal points regarding the damages awarded by the jury in this case. First, Landon argues that it is entitled to judgment as a matter of law regarding the damages awarded for Landon's breach of Section 8C. As this court heard a few minutes ago, that provision uses the phrase payments, reimbursements, and or other consideration provided for in this agreement, including Section 9 below. According to Landon, despite the use of three distinct terms, which expressly contain as part of the whole a separate provision of the contract, this phrase only refers to the reimbursements payable under that separate provision of the contract. We contend that such a construction cannot be correct. First, as a preliminary matter, obviously, it renders the term payments and the term other consideration wholly redundant. Perhaps more importantly, though, it would lead to a patently absurd result. If Landon is right here on this issue, any breach of Section 8C by Landon only requires Landon to comply with another provision of the contract that it's already obligated to comply with. We contend, excuse me, what then would be the point of Section 8C? Indeed, if Landon is right, that whole provision is mere surplusage. We contend that that is not a reasonable interpretation, and that is no more sophisticated than heads I win, tails you lose. And we contend that the trial court correctly rejected that interpretation. A more reasonable interpretation of 8C, what we contend is the only reasonable interpretation, is that it provides ANCOR with a kind of insurance policy. As Mr. Travis mentioned, ANCOR brought Landon into this deal. Landon is the big money investor here. Landon has the ability, if not the incentive, to circumvent ANCOR in this transaction. In order to provide ANCOR with a remedy, if that occurs, Section 8C requires Landon, if it circumvents ANCOR in the transaction, to provide ANCOR with the economic benefits originally contemplated by the parties and described in the LOI. Your Honors, I also wish to address Landon's request that this court reverse and unilaterally render a remediator of the jury's damage award. Put simply, Landon asked for relief that we contend this court cannot grant according to the Supreme Court's decision in Gasparini v. Center for Humanities, Inc. The case site on that is 518 US 415. Gasparini holds that in a diversity case, the trial court, not the appellate court, must determine whether a jury's verdict is excessive according to state law. The appellate court's review is limited to an abuse of discretion standard. In our response brief on this issue, we cite to this court's decision in Foridori v. Gasparini was in many ways more clear than Gasparini itself. The court noted in Foridori that this court may not substitute its own application of the state's remediator rule for the trial courts. So the question here, Your Honors, is not whether the court should simply override what the jury found in this case and reduce the verdict. The question is, did the trial court abuse its discretion when it impliedly ruled that the jury's verdict was not excessive under Delaware law by denying Landon's requested remediator? We contend that Landon has not offered a persuasive argument, that the trial court did so. In fact, Landon's brief fails to so much as mention what Delaware's excessiveness standard is. Without identifying that standard, how can Landon show this court that the trial court abused its discretion in applying the same? Finally, Your Honors, even if the trial court did abuse its discretion in applying the standard I just mentioned, we contend that Landon's requested relief would still be improper. This court spoke much more eloquently than I can when it said in Foridori, quote, a remediator is an order awarding a new trial or a damages amount lower than that awarded by the jury and requiring the plaintiff to choose between those alternatives. Indeed, in Delaware, the offer of a new trial is required when a trial judge orders a remediator of a jury's damage award. And with that, Your Honors, I have about ten seconds left, so I would just like to point out, Landon has also moved for judgment as a matter of law regarding the damages under section nine of the contract. We think the record is clear, as is the precedent of this court. They have forfeited that issue on appeal, and we ask that the court rule on that issue in line with its precedent cited in our briefs. All right. Thank you, Counsel. Thank you. We will hear from Mr. Harrell at this time. Your Honors, and may it please the court. While the record below reveals error on other grounds that I can discuss for three reasons, the court can resolve this appeal by evaluating the issue of damages. First, ANCOR's damages arguments conflict with settled law and lack support in the record. Specifically, although the parties seem to agree that it's black letter law, that the proper remedy on a contract claim is expectation damages. ANCOR offered no evidence that it reasonably expected to receive a transaction fee or five years of management fees on a proposed transaction that never closed, pursuant to a letter of intent that had already expired. The court should therefore grant, pardon me, the court should therefore render a judgment that ANCOR shall recover no damages on its claim for section 8C. Second, for those and other reasons, ANCOR is also not entitled to the promote interest proposed in the LOI. ANCOR did not show, and it cannot show, it had any reasonable expectation that it would receive that proposed interest, given that the LOI had already expired and the proposed transaction was dead. The court should therefore affirm the denial of ANCOR's motion for declaratory judgment. Third, and finally, section 9 of the LOI provided that if the proposed transaction did not close, Landon would pay ANCOR for 80% of the expenses it actually incurred. The court should render a judgment reducing ANCOR's recovery on its section 9 claim in accordance with that unambiguous contractual cap from $362,542 to $246,875.27. Now, as I said at the start, there's many other issues in this appeal, factual, legal, even jurisdictional, but I'll defer to the court on which you would like to address with me during my remaining time. I welcome the court's questions. If the panel has no questions, I'll yield back my time. Thank you, Your Honor. Thank you. All right, we'll hear from Ms. Fernald. Thank you, Your Honors. May it please the court, Courtney Fernald on behalf of ICON. I did have some remarks prepared. Nobody's addressed any issues pertaining to ICON yet today. So I'd like to ask first if the court has any questions about the issues dealing with ICON, and if not, then I'll just make a few remarks. Can ICON tortiously interfere with the Landon LOI? Your Honor, we made the argument that they're a stranger to the, or they're not a stranger, I'm sorry, to the Landon LOI. I understand the position of ANCOR that a lot of the cases dealing with strangers to the LOIs talk about parties and specifically agents. I don't think that it's as limited as ANCOR wants it to be. ICON is the very subject of this deal. The entire purpose of both LOIs, the two LOIs, the one with ANCOR and the one with Landon, are both to bring investors into the ICON deal. And so that's why we said that ICON is not a stranger to the Landon LOI, because it's the very subject of the deal that the Landon LOI is based on. And in fact, it's very clear from the Landon LOI itself and from the entirety of the transaction that the Landon LOI is dependent on ICON's participation. In other words, if ICON decides it doesn't want to do this deal, the Landon LOI terminates and goes away. There is no ANCOR-Landon deal without ICON. Well, but, I mean, where's your case law to support the idea, logical as it may be, that the target of one of these deals can't, as a matter of law, tortiously interfere with the underlying contract? I understand, Your Honor, and we were not able to find a Texas Supreme Court case. We did find one in Florida that dealt with that exact issue, and I understand that that's not binding on this Court. We cited it merely by way of example. But I do think common sense would say that if a party is the subject of the very agreement that it's alleged to have tortiously interfered with, then it should not be able to, as a matter of law. I mean, I guess that's my struggle is, well, can ICON then just do anything it wants to do? I mean, you've got a record here that maybe all things equal would justify submitting to a jury. I mean, the sort of, well, what about ANCOR? Are we going to pay them on their interest? What about this? What about that? That subject comes up between Landon folks and ICON folks, and then there's that nice expletive that basically the jury could use to show a pretty malevolent intent or careless metent, indifferent intent. Can they just do anything they want to do and not be held culpable? No, Your Honor. Where's the line? I mean, that's sort of the struggle, right? Where's the line? Yes, and I agree with that, and I will say that, and I'm glad I did prepare remarks to say, because I will say that even if the court finds that ICON was a stranger to the Landon LOI for purposes of interference, the trial judge got this right. This is a breach of contract case. The evidence that ANCOR is relying on against ICON . . . Which time? Because the trial court first said, no, there's a fact issue. We're going to send this to the jury. Actually, repeatedly, I thought, denied a motion for judgment as a matter of law, denied summary judgment on this, and then abruptly reversed right before the case goes to the jury. And that's the time that I would say the trial judge got it right. Well, I imagine you would, but I mean, the court also didn't say anything about why it reversed course, other than, you know what, this is a contract case. That's true, Your Honor. But we went through, in our briefs, the elements that ANCOR had to have evidence of to show tortious interference, and two of those elements, there was absolutely no evidence sufficient to show tortious interference. And the element that I was going to focus on today, very briefly, since I have a limited amount of time, is the element of proximate cause, because I think that's the element where the most glaring failure of ANCOR's evidence lies. Before getting into the specifics of that, I think it's important to remember that ANCOR's original position, all the way even up into trial, was that the exclusivity period in their letter of intent with ICON continued into August. That was their position at trial, and that's important because if you look at the chain of events that ANCOR is relying on to support its tortious interference claim against ICON, which they summarize very succinctly in their reply brief, that chain of events all starts in early August. And so ANCOR's theory was that while this exclusivity period was still going on, while ICON and Landon had a duty not to do a deal with anybody else, had a duty to be loyal to ANCOR, that ICON and Landon got together and hatched a plot that they were going to cut ANCOR out of the deal. And in fact, when Mr. Keene was asked at the trial, you know, what did ICON interfere with, his answer was that they interfered with ANCOR's ability to complete the deal. That was what he was saying was interfered with. That was their theory. But after Mr. Keene's testimony, during trial, the judge, the trial judge, ruled that the exclusivity and due diligence period, which were tied together, unambiguously expired on July 15th. So the court rejected ANCOR's argument that there was this tail that would carry the exclusivity period into the middle of August. And as I said, that's important because the chain of events that ANCOR is saying constituted the interference didn't begin until early August. So ICON could not possibly have interfered with ANCOR's ability to complete the deal. That's ANCOR-ICON. We're talking about Landon-ANCOR. Sure. And so now ANCOR wants to pivot and use this same chain of events that begins in August to argue that ICON interfered with Section 8C of the Landon LOI. But the evidence doesn't fit that narrower theory, and as I said most glaringly, the element of proximate cause simply isn't there. There is no evidence that but for any action of ICON, Landon would have paid ANCOR what it claims is owed under Section 8C. We cited in our brief the Texas Supreme Court case of HMC Hotel Properties, which discussed in detail what a plaintiff must show to support a jury finding of proximate cause. And it requires evidence, not just suspicion or speculation or conjecture or inference upon inference upon inference, but actual evidence by which a reasonable jury could find that but for the defendant's actions, the breach would not have occurred. Now the Supreme Court in that case found that the evidence did not satisfy that standard and neither does the evidence presented by ANCOR in this case. First of all, Section 8C was drafted by Landon, and the testimony was that that provision was not unique to the LOI with ANCOR. That was a provision that Landon had used in other letters of intent, and it was always intended by them to apply only during the due diligence period of the contract. It was never intended to apply, you know, in infinity as ANCOR took that position. Now obviously ANCOR took the opposite position, and the question was ultimately put to the jury because the judge determined that that provision was ambiguous at least to the idea of does it apply only during due diligence or does it apply forever. But it's clear from all of the evidence that Landon refused to pay ANCOR what it claimed under 8C, not because of any action of ICON, but because Landon and ANCOR disagreed over the interpretation of that provision. That disagreement continues till today in this appeal, and it has nothing to do with any act of ICON. The evidence ANCOR cites as supporting proximate cause is easily refuted and simply doesn't pass muster under the but-for test in the HMC case. ANCOR points to the secrecy of the August-September negotiations between ICON and Landon and argues that ICON wanted to keep ANCOR in the dark because it didn't want ANCOR to find out about the new deal and assert its contractual rights under 8C and scare Landon away. But even if we inferred that type of motive for ICON, which I don't think that we can, I think it would be pure speculation, because there's no evidence that ICON even knew about the non-circumvent provision at that period of time, and the only evidence was that Mr. Keene, in fact, never told ICON about the provision. But even if we could say there's enough that we could infer that ICON had this plot to keep ANCOR in the dark, it can't be evidence of proximate cause because it didn't work. ANCOR did find out about the new deal, and it did assert its claim under 8C months before the closing. And Landon still didn't pay ANCOR on that claim. Why? Not because the negotiations had been a secret, but because Landon disagreed with ANCOR about the interpretation and application of that contractual provision in the Landon LOI. And we see that in the correspondence and ANCOR all the way back in October of 2020, months before the deal actually closed, and ANCOR would have been entitled to anything under 8C. Okay. All right. Thank you, counsel. Thank you. We had five minutes of rebuttal reserved by Mr. Travis. Mr. Travis, before you begin, my question hadn't come up yet. Relative to the exclusion of some only to the claims against Landon, is that correct, the expert testimony that you were not allowed to admit, to introduce? So our expert was Randy Keene, and he did testify. They had offered an expert on damages, and they just never presented it. So I didn't think that that was an issue on the appeal, Your Honor. Okay. All right. Well, just to build on that question, this relates to, I think, the management fee where jury awarded $250,000. Yes. I thought that ANCOR was contending that there was testimony that it should have been more than that, and it was a percentage-based thing and that sort of thing, and the court excluded that, correct? No. Oh, so yes, you're correct. It isn't so much expert testimony. What you're referring to is our fees were supposed to be based on the EBITDA of the company, and so we asked for their just to be polite, the lower court made us read Donde over and over again every time we made a motion. So they were in a trial in Detroit for months, and we were waiting, and finally, nine months went by, and we said, hey, we've got to have these documents. I don't understand that much. My question is simply that that is pertinent to Landon, though, correct? Yeah. Yes. Yeah. We think the damage award could have been a lot higher if the jury never got to hear what their management fee really was. So they gave us the minimum for the five years that Mr. Keene testified he was entitled to. Okay. Go ahead. You can continue with your rebuttal. Sorry, Your Honor. So I want to go back briefly to Landon's argument. They went back to the mantra they repeated over and over again at the trial court that we shouldn't get paid on a deal that we didn't do. Well, of course, that ignores that they took the deal from us. He said there's no evidence. I heard him say this. There's no evidence that Randy Keene really expected to receive any payments for a deal he didn't do. And that's just not true, Your Honors. I direct you to ROA 8565 and 9013. At 9013 specifically, Mr. Keene has asked. So it's my understanding they would be obligated to pay these fees. Absolutely. So we're not asking them to pay for a deal we didn't close, are we? No. We're asking them to pay for the deal that did close, because that's what 8C requires. Yes. Even though our deal didn't close. Yes. Any deal between Landon and Icahn, they needed to reimburse us for those fees. And then he goes on to say, and pay us our expenses. He did testify to that. He also testified repeatedly that the meaning of payments, reimbursements, and other consideration included the transaction fee, the management fee, and the promote fee. So I don't understand where that argument came from. To respond to Icahn's argument, I think the court picked up on it. No one ever comes to the trial court saying, yes, we interfered with the contract. So we have to rely on inferential evidence. The inferential evidence, I mean, the key evidence is they start negotiating a deal right away. Roy Williams never testified. So we didn't ever really hear from their witnesses. But we put on videotape, the only person from Icahn is Terry Trekus. And if you read his testimony, he says, well, if you know Roy Williams, he was never going to pay that promote. But not only does Trekus, but the investment bankers testify, well, Icahn needed money. And Mr. Keene testified, well, they'd been looking for an investment partner a year before we came along, and they needed money. So the evidence that they tortuously interfered is they needed this investment. They needed this happen, but they didn't want to do it with us. But where's your law that says that a target of a deal like this is either a stranger to the contract, an underlying contract, or can interfere with that LOI? So the stranger concept was misapplied. And I thought we pointed that out in our brief. The cases that they cite, those are cases where somebody is an agent for someone else, and now they can't interfere. But they weren't an agent for Landon. Yeah, but they're the very target of the whole, they're the very subject of the underlying agreement. They were indeed. Where's your case that supports the idea that they can nonetheless tortuously interfere? I think I don't have a case on all fours. I wish I did, and I'd give it to you. But I think there's nothing that says, the cases that say, you know, you have to be a stranger to the contract, somehow there has to be a relationship. And they didn't have any relationship. The relationship was ours. We had an LOI with Icahn. We had an LOI with Landon. They didn't have any relationship with each other until they tortuously interfered with Landon's agreement to interfere with their obligations to us. So I hope that answers your question. I'm looking, I'm out of time, I guess. Did I answer the court's questions? Yes. All right. Thank you, Your Honors. We appreciate your time. Thank all of you all for your briefing on the case and for your oral presentations. Today, the court will consider the case submitted and render its decision in due course.